387 F.2d 220
 128 U.S.App.D.C. 262
 BUCKEYE CABLEVISION, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
D. H. Overmyer Telecasting Co., Permittee of UHF Television
Station WDHOTV, Storer Broadcasting Co., The
Association of Maximum Service
Telecasters, Inc., Intervenors.
 No. 20274.
 United States Court of Appeals District of Columbia Circuit.
 Argued Jan. 9, 1967.
Decided June 30, 1967.
 
 Mr. Robert A. Marmet, Washington, D.C., with whom Mr. Peter L. Koff, Washington, D.C., was on the brief, for appellant. Mr. Edwin R. Schneider, Jr., Washington, D.C., also entered an appearance for appellant.
 Mr. John H. Conlin, Associate Gen. Counsel, F.C.C., with whom Mr. Henry Geller, Gen. Counsel, and Mrs. Lenore G. Ehrig, Counsel, F.C.C., were on the brief, for appellee.
 Mr. Victor E. Ferrall, Jr., Washington, D.C., with whom Messrs. Bernard Koteen and Alan Y. Naftalin, Washington, D.C., were on the brief, for intervenor Storer Broadcasting Co.
 Messrs. Peter Shuebruk and Herbert M. Schulkind, Washington, D.C., were on the brief for intervenor D. H. Overmyer Telecasting Co.
 Messrs. Ernest W. Jennes and John E. Vanderstar, Washington, D.C., were on the brief for intervenor Association of Maximum Service Telecasters, Inc.
 Before BAZELON, Chief Judge, PRETTYMAN, Senior Circuit Judge, and DANAHER, Circuit Judge.
 BAZELON, Chief Judge:
 
 
 1
 Buckeye Cablevision operates a community antenna television system (CATV) in Toledo, Ohio. Prior to May 27, 1966, it supplied paying subscribers with the signals of nine television stations located in Detroit, Lansing, Windsor, and Toledo. The signals are captured from the atmosphere with a master antenna and then retransmitted via cable to the subscribers' sets, which are specially wired for cable reception. On May 27, 1966, the Federal Communications Commission ordered Buckeye to cease and desist from carrying the signal of station WJIM-TV, Lansing, Michigan.[1] FCC regulations[2] prohibit CATV systems operating within one of the one hundred largest markets from extending the signals of distant stations beyond their 'Grade B Contour'[3] unless the Commission has previously determined in a hearing that such carriage will be 'consistent with the public interest and specifically the establishment and healthy maintenance of television broadcast service in the area.'[4] Buckeye sought no such determination. Instead, it brought this review proceeding to challenge the Commission's distant-signal rules and the cease-and-desist order issued under them.
 
 
 2
 The distant-signal rules were first published in the Federal Register on March 17, 1966, as part of the Commission's Second Report and Order on CATV wherein it asserted jurisdiction over all CATV systems and adopted a comprehensive regulatory scheme.[5] The distant-signal rules are applicable to all systems that began carrying a distant signal after February 15, 1966. Buckeye began carrying WJIM-TV on March 16, 1966-- the day the system went into operation-- which is one month after the cutoff date and one day prior to the publication of the rules in the Federal Register. WJIM-TV is a 'distant signal' and Toledo is one of the one hundred largest markets.
 
 
 3
 (1) A threshold question of first impression is whether the FCC has jurisdiction to regulate those CATV systems which employ no microwave transmission.[6]
 
 
 4
 The Communications Act, which directs the Commission to provide 'a rapid, efficient, Nation-wide and world-wide wire and communication service * * *,'[7] applies to 'all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or transmission of energy by radio * * *.'[8] To achieve the goals of the Act, the Commission is directed, inter alia, to establish 'areas or zones to be served by any (broadcase) station,'[9] to issue broadcast licenses to 'provide a fair, efficient, and equitable distribution of radio service' to the states and communities of the United States,[10] and to promulgate rules and regulations to effectuate its responsibilities.[11]
 
 
 5
 The Commission determined in the Second Report and Order that CATV systems are engaged in 'communications by wire' within the meaning of the Act.[12] It had already found that such systems enlarge the number of stations otherwise available to their subscribers, thereby splintering the market, and potentially decreasing audience size and, ultimately, the advertising revenues of local stations.[13] It concluded that further unregulated growth of CATV represents a substantial economic threat to licensed television broadcast stations, and thus to the system of station allocations the Commission has established.
 
 
 6
 To meet this situation in the major population centers, the Commission promulgated the distant-signal rules, relying on its responsibility to insure 'fair and equitable' station distribution by regulating service 'areas and zones.' The CATV threat in the major markets is especially serious, because large scale CATV operation in these markets might deter and possibly destroy the development of free, nonnetwork UHF stations which, for a variety of reasons, are likely to ve economically weak even without CATV competition.[14] Although there is some evidence concerning adverse CATV impact in these markets, the extent of the danger is not yet clear enough for the application of fixed prohibitions. The rules reflect the Commission's decision to examine each situation on an adhoc basis. We think it has chosen an eminently reasonable course. The growth of CATV is so rapid that, if it is allowed to proceed unabated, harm to the regulatory scheme can occur before the FCC can act.[15] Further, subsequent regulation might disrupt large numbers of CATV systems with heavy capital investment and substantial public reliance on their services. The distant-signal rules afford the Commission an opportunity to determine on a case-by-case basis whether the public interest in the future of communications will be obstructed by each CATV operation.
 
 
 7
 Buckeye argues, however, that the Commission cannot rest jurisdiction on CATV's close relationship to regulated broadcase stations. It points out that the asserted basis for regulation is Subchapter III of the Communications Act which provides for the licensing of broadcasting,[16] and that CATV systems are not broadcasters subject to licensing because they do not employ radio frequencies to distribute signals. Relying on Regents of the University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363 (1950), Buckeye asserts that the FCC's only permissible function under Subchapter III is licensing of broadcasters, and thus it may not control the signals Buckeye can deliver to its customers. We think this reliance is misplaced.
 
 
 8
 In Carroll, the Supreme Court held that the Commission's duty to effectuate the public interest requirements of Subchapter III 'centered'[17] around its licensing power, which does not encompass abridgment of contracts between licensees and third parties. But the Court's view of this limitation was based largely on the agency's lack of authority at that time to issue cease-and-desist orders, against licensees or anyone else, to prevent violations of the Act. Subsequently Congress conferred such authority,[18] which correspondingly expanded the Commission's power to protect the regulatory scheme. We do not have to decide the degree to which Carroll may still be viable since we think that, in any event, it does not bar Commission authority to regulate a form of wire communication which enlarges the signal range of licensee stations to the potential detriment of the entire regulatory scheme.[19]
 
 
 9
 Our view is bolstered by the cases which have recognized implied agency authority to deal with aligned activities which may affect the regulatory system entrusted to the agency. 'congress in passing the Communications Act of 1934 could not * * * anticipate the variety and nature of methods of communication by wire or radio that would come into existence * * *. In such a situation, the expert agency entrusted with administration of a dynamic industry is entitled to latitude in coping with new developments in that industry.'[20] It would 'frustrate the purposes for which * * * (the Act) was brought into being (if Congress had attempted) an itemized catalogue of the specific manifestations of the general problems for the solution of which it was establishing a regulatory agency.'[21]
 
 
 10
 We reject Buckeye's further contention that it engages only in intrastate commerce and is therefore exempt from FCC regulation. Although Buckeye and its customers are located in the Toledo area, its facilities are a link in the interstate transportation of television signals. It receives programs which originate outside the state and retransmits them by cable to its customers.[22]
 
 
 11
 ( 2) The distant-signal rules are also challenged as an illegal restraint on First Amendment rights. It is true that CATV systems disseminate programs carrying a wide range of information. But we think the restraint imposed by the rules is no more than is reasonably required to effectuate the public interest requirements of the Act.[23] As we have pointed out, the rules are not a flat bar against distant-signal importation. The restraint may be only temporary if Buckeye can show that carrying WJIM-TV will not adversely affect broadcasting in Toledo.
 
 
 12
 Buckeye claims, however, that, as a practical matter, the heavy burden established by the Commission for such hearings makes relief only a remote possibility and thus that the restraint is absolute. Although the regulations are phrased in broad terms, we cannot say that on their face they impose such a heavy burden.[24] And, since Buckeye has not sought any hearing, we cannot know how the Commission will apply them. Buckeye's complaint is therefore premature.
 
 
 13
 ( 3) Buckeye also contends that the rulemaking proceedings under review violated the requirements of the Administrative Procedure Act in several respects.
 
 
 14
 It says first that the Notice of Inquiry issued on April 22, 1965, failed adequately to specify the substance of the proposed rules. We cannot agree. The Notice was issued simultaneously with the FCC's assertion of jurisdiction over CATV systems employing microwave carriers and its issuance of regulations to deal with them.[25] The Notice sought comments on the Commission's view favoring assertion of jurisdiction over all CATV systems and on its proposal to adopt for such non-microwave systems the 'carriage' and 'nonduplication' rules it had adopted that day for CATV systems employing microwave carriers. The Notice also discussed 'the mushrooming entry of CATV into major centers of population,' and the Commission specifically requested comment on a rule that would prohibit extending the signal of any station beyond its Grade B contour into markets that were defined so as to include Toledo.[26]
 
 
 15
 Buckeye secondly contends that the Notice of Inquiry misled interested parties to believe that further notice and opportunity for comment would precede the adoption of final rules. The Commission did suggest that a further Notice would 'in all likelihood' be issued 'to afford opportunity for comment on' its proposals. But the Commission also made clear that it desired full comment so as to be in a position to establish rules without further proceedings.[27] Numerous interested parties filed extensive comments on the rules in question,[28] and there is no evidence or claim that any of them withheld pertinent data or argument in reliance upon the possibility of a future proceeding. And we find no basis for Buckeye's assertion of bad faith on the part of the Commission. We are entirely satisfied that any possible ambiguity in the Commission's statements did not affect the fairness of the proceedings.
 
 
 16
 Buckeye next complains that, although the Administrative Procedure Act does not require an evidentiary hearing or oral argument,[29] the opportunity should have been given because of the importance of the issues. It does not suggest what arguments and data required such presentation, and why.[30] In these circumstances, we find no basis for disturbing the Commission's discretion to control the course of its own proceedings.[31]
 
 
 17
 ( 4) We also reject Buckeye's contention that the distant-signal rules constitute invalid retroactive regulation. Although published in the Federal Register on March 17, 1966, the rules are applicable to all CATV systems that began carrying distant signals after February 15, 1966. The rules do not penalize Buckeye for carrying distant signals during the period prior to their effective date; rather they make carriage of such signals illegal from and after the effective date.
 
 
 18
 The rule is not retroactive,[32] but simply confers 'grandfather rights' upon those systems which began carrying distant signals before the regulations were announced. The cutoff date-- february 15-- is the date of the Commission's first and widely circulated public announcement that it had adopted the distantsignal rules and that they would be applicable to operations thereafter commenced. The Commission sought to avoid unnecessary disruption of the viewing habits of those who had subscribed to CATV prior to the adoption of the regulations. On the other hand, it faced the danger that many new systems, not yet in operation, would begin nominal operations in the major markets to avoid the requirement of a public interest determination and thus destroy the plan.[33]
 
 
 19
 We think the 'grandfather rights' manifested the Commission's 'felt need for regulating * * * (CATV), while at the same time * * * satisfied the dictates of fairness by affording sanction for enterprises theretofore established.'[34]
 
 
 20
 ( 5) Finally, we find no merit in the claims that the Commission unfairly and illegally expedited the cease-and-desist hearing and that it erroneously refused to consider any question at the hearing aside from the narrow one whether Buckeye was operating in violation of the rules. The Commission, relying in part on information developed in the rulemaking proceedings, amply justified its decision to expedite action.[35] And, since the record was not closed until Buckeye had indicated that it would not introduce evidence directed to the question whether carriage of WJIM was a violation, Buckeye was not prejudiced by the expedited procedure followed. Moreover, many of the issues Buckeye sought to ventilate at the cease-and-desist hearing were considered by the Commission in the Second Report and Order and in its denial of Buckeye's request for waiver of the distant-signal rules.[36]
 
 
 21
 Affirmed.
 
 
 
 [1]
 3 F.C.C.2d 798
 
 
 [2]
 47 C.F.R. 74.1107
 
 
 [3]
 A 'Grade B Contour' is the line representing the service area in which a good picture is available 90 percent of the time at 50 percent of receiver locations. See Sixth Report and Order, Federal Communications Commission, 17 Fed.Reg. 3905, 3915 (1952). A CATV system is deemed to be operating within one of the one hundred largest markets for the purpose of the regulation whenever it is located within the Grade A Contour of any television station located in one of these markets. A 'Grade A Contour' is the service area in which a good picture is available 90 percent of the time at 70 percent of receiver locations. Ibid
 
 
 [4]
 The regulations also provide for a waiver of the rules in certain situations. 47 C.F.R. 74.1109. The Commission denied Buckeye's petition for a waiver, 3 F.C.C.2d 808 (1966), but Buckeye does not appeal from that denial
 
 
 [5]
 2 F.C.C.2d 725 (1966). The Commission also adopted, inter alia, regulations controlling the degree to which CATV systems can duplicate the programing of local broadcasters, and stipulating the situations in which local broadcast stations must be carried by the systems. We are concerned only with the distant-signal rules, and not with any of the other regulations adopted by the Commission
 
 
 [6]
 Compare our decision in Carter Mountain Transmission Corp. v. Federal Communications Commission, 116 U.S.App.D.C. 93, 321 F.2d 359, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), where we upheld the Commissions' power to regulate CATV systems served by microwave through its power to regulate microwave carrigers. And see First Report and Order on CATV, 38 F.C.C. 683 (1965), in which regulations applicable to microwave-served systems were adopted
 
 
 [7]
 47 U.S.C. 151 (1964)
 
 
 [8]
 47 U.S.C. 152 (1964)
 
 
 [9]
 47 U.S.C. 303(h) (1964)
 
 
 [10]
 47 U.S.C. 307(b) (1964)
 
 
 [11]
 See 47 U.S.C. 154(i), 303(f), (r) (1964)
 
 
 [12]
 47 U.S.C. 153(a) (1964). Buckeye does not dispute the Commission's conclusion that since CATV systems transmit 'pictures and sounds * * * by aid of wire' and are 'instrumentalities * * * (used for) * * * the receipt, forwarding, and delivery of communications * * * incidental to such transmission,' they are engaged in wire communication
 
 
 [13]
 See generally First Report and Order on CATV, 38 F.C.C. 683 (1965); Carter Mountain Transmission Corp. v. Federal Communications Commission, supra note 6
 
 
 [14]
 In large metropolitan areas already served by television stations affiliated with the three major networks, new UHF entrants must offer independent nonnet-work programing. The audience for such programing is limited (according to FCC estimates, about 10 percent of viewers during prime viewing hours), and UHF stations are further handicapped by the fact that many receivers are not equipped for UHF reception. This problem has been remedied by congressional passage of legislation designed to allow the FCC to require UHF capability for all commercial receivers. 47 U.S.C. 303(s) (1964). And see H.R. REP. No. 1559, S. REP. No. 1526, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, p. 1873. But this legislation which reflects Congressional concern for the development of UHF independent stations, has not yet fully taken hold. Thus the new UHF entrant may have a difficult time operating at a profit. CATV can compound the problem. Its chief attraction in the markets already possessing full network coverage would be its ability to offer the programs of independent stations. Thus it would splinter the already limited market for nonctwork programing
 
 
 [15]
 See Second Report and Order on CATV, 2 F.C.C.2d 725, 771-72
 
 
 [16]
 47 U.S.C. 301 et seq. (1964). The Commission has declined to regulate CATV under the common carrier provisions of Subchapter II. See Philadelphia Television Broadcasting Co. v. Federal Comunications Commission, 123 U.S.App.D.C. 298, 359 F.2d 282 (1966)
 
 
 [17]
 338 U.S. at 599
 
 
 [18]
 47 U.S.C. 312(b) (1964)
 
 
 [19]
 It is clear that a CATV system is more than simply a passive recipient of television signals, indistinguishable from a rooftop antenna; CATV systems engage in commercial retransmission of the signals they receive. We also reject the suggestion that the Commission's powers are rigidly compartmentalized into 'liconsing' and 'public utility regulation' functions. See Carter Mountain Transmission Corp. v. Federal Communications Commission, supra, note 6. Regardless of the label attached to the distant-signal rules, they reflect a reasonable exercise of Commission power to prevent the extension of television signals beyond their predicted range whenever such extension is not in the public interest
 
 
 [20]
 Philadelphia Television Broadcasting Co. v. Federal Communications Commission, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966)
 
 
 [21]
 National Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1843). See also American Trucking Association v. United States, 344 U.S. 298, 311, 73 S.Ct. 307, 97 L.Ed. 337 (1953) (I.C.C. may regulate practices not mentioned in Act which may directly frustrate the success of the regulatory scheme)
 
 
 [22]
 See Idaho Microwave v. Federal Communications Commission, 122 U.S.App.D.C. 253, 256, 352 F.2d 729, 732 (1965)
 
 
 [23]
 National Broadcasting Co. v. United States, 319 U.S. 190, 226-227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Carter Mountain Transmission Corp. v. Federal Communications Commission, 116 U.S.App.D.C. 93, 98, 321 F.2d 359, 364, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963)
 
 
 [24]
 A CATV system must show the distant-signal carriage 'will be consistent with the public interest and specifically the establishment and healthy maintenance of television broadcasting service in the area.' Given the conjecture presently surrounding the question of CATV impact, perhaps these regulations are as specific as possible
 
 
 [25]
 First Report and Order on CATV, 38 F.C.C. 683 (1965)
 
 
 [26]
 See Notice of Inquiry and Proposed Rulemaking, 1 F.C.C.2d 453, 471-72 (1965). We cannot agree with Buckeye that the failure to mention 'grandfather rights' is a fatal defect in the Notice. The Administrative Procedure Act requires only that the notice contain 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.' 5 U.S.C.A. 553(b)(3) (1966). See Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 210 F.2d 24 (1954); Owensboro on the Air, Inc. v. United States, 104 U.S.App.D.C. 391, 262 F.2d 702 (1958), cert. denied, 360 U.S. 911, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959)
 
 
 [27]
 The Commission said:
 In the absence of further information, we do not have a sound basis for specific rule proposals. However, in order to be in a position to take any rule-making action found appropriate at the conclusion of this proceeding, without conducting new proceedings, comments are requested on the proposals of petitioners and the additional matters indicated above. Consideration of nonmicrowave CATV systems is included in order to conserve time and to avoid the necessity for a second proceeding, particularly in the event that no legislation is forthcoming and the comments in this proceeding confirm our initial conclusion that the Commission has present jurisdiction over all CATV systems. Moreover, we believe it appropriate * * * to put all persons who now operate or who propose to operate CATV systems on notice that CATV operations may be subject to Commission regulation of the nature indicated, whether microwave is used or not. 1 F.C.C.2d at 476-77.
 
 
 [28]
 Sixty interested parties, many of whom also represented other interested persons, filed comments and/or reply comments in this proceeding. See Second Report and Order, 2 F.C.C.2d 789-90 (1966). In addition, the Commission reported receiving a large number of informal comments and letters. Id. at 726 n. 2. The views expressed are summarized at Id., pp. 790-93
 
 
 [29]
 The Administrative Procedure Act requires only that interested parties be allowed to submit data and argument 'with or without opportunity to present the same orally in any manner.' 5 U.S.C.A. 553(c) (1966)
 
 
 [30]
 See American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Buckeye's principal contention seems to be that the numerous conflicting comments submitted made oral argument necessary so that the Commission could clarify and synthesize the written inconsistencies. It seems peculiarly within the Commission's discretion to decide whether it needs oral argument to sort out conflicts in the rulemaking comments. At any rate, the distant-signal rules were promulgated not after conflicts were resolved, but because of the Commission's determination that these were questions of CATV impact that could not presently by resolved. Buckeye has failed to show how oral presentation would have supplied answers to these questions
 
 
 [31]
 Federal Communications Commission v. WJR, The Goodwill Station, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949). And see 47 U.S.C. 154(j) (1964) which authorizes the FCC to 'conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice.'
 
 
 [32]
 Even a rule of retroactive effect is valid if reasonable. See, e.g., Niagara Mohawk Power Corp. v. Federal Power Commission, decided May 18, 1967, 126 U.S.App.D.C. 376, 379 F.2d 153. For the reasons discussed infra, we find thd present rule reasonable
 
 
 [33]
 The Commission has set out an adequate basis for these fears in the Second Report and Order, 2 F.C.C.2d 725, 784-85 (1966), and in its Memorandum Opinion and Order denying motions for a stay of the rules pending decision on petitions for reconsideration. See 3 F.C.C.2d 816, 819-23 (1966). While the Commission could not be certain how many systems would seek to beat the gun, there was evidence that a large number of systems were preparing to begin operations, and that many of them were located in the major markets
 Any date the Commission could have selected would have adversely affected some CATV systems preparing for operation. But those contemplating entering the field have been on notice since April 22, 1965, that the Commission might adopt regulations like the distantsignal rules, and presumably could plan accordingly. And the impact of the Commission's choice of a cutoff date is ameliorated since the affected systems can attempt to show that their importation of distant signals would be consistent with the public interest.
 
 
 [34]
 United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162 (1939). We also reject Buckeye's claim that the FCC lacked sufficient 'good cause' to make the rule effective on March 17, the day of publication in the Federal Register, rather than waiting the full 30 days normally required by the Administrative Procedure Act, 5 U.S.C.A. 553(d) (1966). Since the cutoff date had been set at February 15, the Commission properly sought to minimize the disruption in service to CATV subscribers that would result when the rules became effective
 
 
 [35]
 See 3 F.C.C.2d 798, 801-05 (1966)
 
 
 [36]
 3 F.C.C.2d 808 (1966). Consequently our decision in C.J. Community Services v. Federal Communications Commission, 100 U.S.App.D.C. 379, 246 F.2d 660 (1957), is inapplicable. And see Booth American Co. v. Federal Communications Commission, 126 U.S.App.D.C. 97, 374 F.2d 311 (1967)