INDIANA BROADCASTING CORPORA-
TION (WANE–TV), Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION,

and

United States of America,
Respondents,

G T & E Communications Inc.,
Intervenor.

INDIANA BROADCASTING CORPORA-
TION (WANE–TV), Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION,

and

United States of America,
Respondents,

Shardco Cablevision, Inc., Intervenor.

Nos. 20833, 20990.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 9, 1967.

Decided Dec. 5, 1968.

# 682

Mr. Ernest W. Jennes, Washington, D. C., with whom Mr. Robert J. Muth, Washington, D. C., was on the brief, for petitioner.

Mr. Robert D. Hadl, Counsel, Federal Communications Commission, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, and Mr. Howard E. Shapiro, Atty., Department of Justice, were on the brief, for respondents. Mr. William L. Fishman, Counsel, Federal Communications Commission, also entered an appearance for respondent Federal Communications Commission in No. 20,833.

Mr. David H. Lloyd, Washington, D C., with whom Mr. Reed Miller, Washington, D. C., was on the brief, for intervenor in No. 20,833. Mr. Paul A. Porter, Washington, D. C., also entered an appearance for intervenor in No. 20,833.

Messrs. John D. Matthews and Daniel M. Redmond, Washington, D. C., entered appearances for intervenor in No. 20,990.

Before FAHY, Senior Circuit Judge, and BURGER and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Petitioner, Indiana Broadcasting Corporation, the licensee of WANE-TV, a Fort Wayne, Indiana, UHF television station, seeks review of two memorandum opinions and orders of the Federal Communications Commission[1] denying petitioner's requests for an evidentiary hearing on proposals by GT&E Communications, Inc. (GT&E) and Shardco Cablevision, Inc. (Shardco), the intervenors here, to carry distant signals[2] on community antenna television (CATV) systems[3] in two localities lying between petitioner's Grade A and Grade B contours.[4] The controversy arose when GT&E and Shardco gave notification of their intention to operate CATV systems[5] in Angola, Indiana, and Delphos, Ohio, respectively, and petitioner resisted importation of distant signals on those systems. The proceedings before the Commission culminated in grants to GT&E and Shardco, by the orders under review, of the authority sought.

The Commission's distant signal rule prohibits a CATV system from distributing distant signals within the predicted Grade A contour of a station in the Nation's 100 largest television markets save upon a determination that their introduction will be "consistent with the

---

1. In re GT&E Communications, Inc., 6 F.C.C.2d 643 (1967); In re Shardco Cablevision, Inc., 8 F.C.C.2d 71 (1967).

2. By the Commission's regulations, "[t]he term 'distant signal' means the signal of a television broadcast station which is extended or received beyond the Grade B contour of that station." 47 C.F.R. § 74.1101(i) (1968). The reference to the station's Grade B contour incorporates one of the field intensity contours computable in accordance with specifications set forth in the regulations. See note 4, infra.

3. For the Commission's definition of a community antenna television system, see

47 C.F.R. § 74.1101(a) (1968). See also First Report and Order, 38 F.C.C. 683 (1965); Second Report and Order, 2 F.C.C.2d 725 (1966).

4. A station's Grade A contour is the boundary of the area wherein the best 70% of receiver locations obtain good picture quality 90% of the time. Its Grade B contour bounds the area wherein the best 50% of locations receive a good picture 90% of the time. See Sixth Report and Order, 17 Fed.Reg. 3905, 3915 (F.C.C. 1952); 47 C.F.R. §§ 73.683–73.684 (1968).

5. Pursuant to 47 C.F.R. § 74.1105(a) (1968).

public interest, and specifically the establishment and healthy maintenance of television broadcast service in the area."[6] For purposes related to adjudication on that score, "a full evidentiary hearing," unless waived,[7] is required.[8] In all other instances, however, the regulations forbid a CATV extension of distant signals only if the Commission finds that the projection will be inconsistent with those criteria, and invoke the Commission's discretion as to whether, on its own motion or on petition by an interested party, a hearing on the matter is to be conducted.[9]

Fort Wayne has a population[10] of 161,776.[11] It is the 96th largest television market in the country. The Commission has assigned five channels, all UHF, to Fort Wayne. Three of these, all commercial, are in use by network-affiliated stations. The Commission has received no applications for the two remaining, one of which is an educational channel.

Angola, with a population of 4,746, is situated about 35 miles northerly of Fort Wayne, within its television market. It is outside the Grade A contours, but within the Grade B contours, of the three Fort Wayne stations, as well as of two share-time stations in Lansing, Michigan. GT&E proposed to carry the signals of these five stations,[12] along with distant signals from a total of five other stations in South Bend, Indiana, and Kalamazoo and Lansing, Michigan.

Delphos, located about 41 miles southeasterly from Fort Wayne, has a population of 6,961. It lies within the Grade A contour only of WIMA-TV, a network-affiliated station in Lima, Ohio,[13] and, of the Fort Wayne stations, only within the Grade B contour of WANE-TV.[14] Shardco proposed to supply its subscribers with the signals of these two stations,[15] together with the distant signals of a total of 11 stations at two points in Indiana and three in Ohio.[16]

6. "No CATV system operating in a community within the predicted Grade A contour of a television broadcast station in the 100 largest television markets shall extend the signal of a television broadcast station beyond the Grade B contour of that station, except upon a showing approved by the Commission that such extension would be consistent with the public interest, and specifically the establishment and healthy maintenance of television broadcast service in the area. Commission approval of a request to extend a signal in the foregoing circumstances will be granted where the Commission, after consideration of the request and all related materials in a full evidentiary hearing, determines that the requisite showing has been made. * * *" 47 C.F.R. § 74.1107(a) (1968).

7. See 47 C.F.R. § 74.1109(a). See also Channel 9 Syracuse, Inc. v. FCC, 128 U.S.App.D.C. 187, 385 F.2d 969 (1967); Hubbard Broadcasting Co. v. FCC, 128 U.S.App.D.C. 197, 385 F.2d 979 (1967).

8. 47 C.F.R. § 74.1107(a) (1968), quoted supra note 6.

9. "No CATV system, located so as to fall outside the provisions of paragraph (a) of this section, shall extend the signal of a television broadcast station beyond the Grade B contour of that station,

where the Commission, upon its own motion or pursuant to a petition filed under § 74.1109, determines, after appropriate proceedings, that such extension would be inconsistent with the public interest, taking into account particularly the establishment and healthy maintenance of television broadcast service in the area." 47 C.F.R. § 74.1107(c) (1968).

10. Population references herein are to the 1960 census.

11. As to the size and location of WANE-TV's viewing audience, however, see the text infra pt. III.

12. This would be required by the Commission's carriage rule. See note 64, infra, and accompanying text.

13. WIMA-TV did not object to Shardco's project.

14. The Commission had assigned two UHF channels to Lima, Ohio, and another to Defiance, Ohio, and an application for the latter was pending. A predicted contour could be placed over Delphos by stations at the reference points in those communities.

15. As required by the carriage rule. See note 64, infra.

16. The Grade B contours of the two Indiana stations, one of which was in Fort

Petitioner asserted in opposition that these projects would detrimentally affect the development of UHF broadcasting in the area by wreaking economic damage upon Fort Wayne's existing stations and by discouraging interest in its unassigned commercial channel. Petitioner endeavored to support these positions by a variety of contentions, including prominently the theory that the two proposals involved should be evaluated in terms of the cumulative effect, present and potential, of all CATV activity within its service area.

These arguments the Commission found wanting.[17] The allegation respecting an adverse impact on utilization of Fort Wayne's available commercial channel, said the Commission, was "not adequately supported,"[18] and the distant signal rule would in any event lay its burden upon any CATV proponent seeking entry inside the Grade A contour of either of the Fort Wayne stations. Examining next the welfare of those stations, the Commission noted that only petitioner had objected and, adverting to its omission "to supply specifics regarding its present financial condition, the impact any present CATV activity has had on its operations, or the exact nature of the other CATV proposals it refers to,"[19] the Commission concluded from available information that neither proposition before it could alone bring material harm to WANE-TV. Even if

the "cumulative" argument were indulged, the Commission, referring to its carriage[20] and nonduplication[21] rules, did "not believe that the present CATV activity between WANE-TV's predicted grade A and grade B contours is extensive enough to raise any question of substantial impact on WANE-TV."[22] And since such activity within WANE-TV's Grade A contour was subject to the distinct requirements of the distant signal rule, the Commission felt that it "need not be counted here in considering cumulative impact."[23] On the basis of this analysis, the Commission, one member dissenting,[24] dismissed petitioner's bid for an evidentiary hearing and held that the operations proposed by GT&E and Shardco would be consistent with the public interest.[25]

Petitioner presses on this review the thesis that the Commission erred in these dispositions. This claim, in its several major facets, we investigate in the ensuing parts of this opinion. From this consideration, we ultimately reach the conclusion that the Commission must be affirmed.

### I

■ We first consider the contention that the Commission's refusal to examine petitioner's contentions in an evidentiary hearing represented an unreasonable deviation from the administrative policies, established in non-CATV

Wayne, fell short of Delphos by 2.2 and 7.6 miles, respectively, but petitioner was amenable to carriage of those stations on Shardco's system.

17. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 644–45; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 72–73.

18. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 644; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 72.

19. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73.

20. See note 64, *infra*, and accompanying text.

21. See note 63, *infra*, and accompanying text.

22. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73.

23. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73.

24. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 646; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73–74.

25. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73.

cases, designed to foster UHF broadcasting. Petitioner refers us to a number of proceedings in which the Commission designated for hearing, or denied on the pleadings without hearing, contested proposals for alterations in broadcast facilities that would have initiated VHF service in all-UHF areas,[26] including the northern Indiana all-UHF enclave.[27] Since the projects now before us would convey by CATV a number of distant signals into the all-UHF Fort Wayne market, petitioner argues that the Commission, in approving them without a hearing, arbitrarily discarded years of settled precedent.[28]

We disagree. Petitioner's requests for a hearing were denied in the view that they were critically deficient in terms of requirements set by the Commission's CATV regulations. We find that the regulations by which the requests were measured are reasonably calculated to promote rather than abridge the regulatory scheme by which UHF has traditionally been afforded special protection. We later sustain the Commission's decisions against charges that it misapplied its regulations and disregarded the considerations upon which they are based. In sum, what we say now is that in rejecting petitioner's efforts to obtain an evidentiary hearing, the Commission did not become unfaithful to the past.

Quite recently, the Commission conducted a comprehensive rule-making proceeding which led to the issuance in 1966 of its Second Report and Order [29] asserting its jurisdiction over CATV [30] and formulating the precepts by which it was to be governed.[31] Vitally involved in this process was the balance to be struck between the contributions to improved and more widespread television service made possible by CATV,[32] on the one hand, and the effect of CATV upon the healthy maintenance of free local television broadcasting on the other.[33] The Commission evinced principal concern over the full utilization of UHF channels for multiple local service in the major markets, and over the effect of CATV on the development of independent UHF stations for that purpose.[34] Contemporary information did not, however, enable the Commission to adopt a wholly comprehensive set of regulations integrating CATV in all of its aspects into the national television system, nor did it seem possible to the Commission to give advance treatment to every possible enigma in the proliferating CATV field.[35] What emanated, as the Commission's solution, were the CATV regulations involved in this suit.[36]

These regulations reflect the Commission's expert judgment that the still unknown repercussions of CATV on UHF

26. *See, e. g.*, In re Central Coast Television, 2 F.C.C.2d 306, modified 3 F.C.C. 2d 524 (1966); In re Triangle Publications, Inc., 29 F.C.C. 315 (1960), aff'd sub nom. Triangle Publications, Inc. v. FCC, 110 U.S.App.D.C. 214, 291 F.2d 342 (1961).

27. Amendment of Section 3.606 (Lafayette-Terre Haute, Indiana), 16 R.R. 1640, 1642 (1958). Compare Channel Assignment in Bloomington-Indianapolis, 1 F.C.C.2d 496, 500 (1965).

28. See Miners Broadcasting Serv., Inc. v. FCC, 121 U.S.App.D.C. 222, 349 F.2d 199 (1965); Melody Music, Inc. v. FCC, 120 U.S.App.D.C. 241, 245 F.2d 730 (1965). *Cf.* Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 238, 230 F. 2d 204, 206, cert. denied 350 U.S. 1007, 100 L.Ed. 869 (1956).

29. 2 F.C.C.2d 725 (1966).

30. 2 F.C.C.2d at 734–45. See also United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967).

31. 2 F.C.C.2d at 746 *et seq.*

32. See *id.* at 745–46.

33. *Id.* at 746 *et seq.*

34. *Id.* at 781–82. Congress manifested a similar concern in the passage of all-channel receiver legislation. 76 Stat. 150 (1962), 47 U.S.C. § 303(s).

35. See, *e. g.*, 2 F.C.C.2d at 776, 881.

36. *Id.* at 797–808.

broadcasting in major markets could be intelligently ascertained only on an *ad hoc* basis.[37] They also demarcate a specific zone in which the Commission, virtually as a matter of course, examines in the context of an evidentiary hearing the potential impact of CATV on UHF and, in turn, on the public interest.[38] And they provide for an investigatory hearing in any other case when from the written presentations a substantial public interest question appears.[39]

We ourselves have had occasion to address the problem of CATV impingement on UHF broadcasting and the Commission's regulatory mechanism for dealing with it. In Buckeye Cablevision, Inc. v. FCC,[40] we noted that "[t]he CATV threat in the major markets is especially serious, because large scale CATV operations in these markets might deter and possibly destroy the development of free, nonnetwork UHF stations which, for a variety of reasons, are likely to be economically weak even without CATV competition."[41] We held that the Commission's decision to examine, on a case-by-case basis, the effects of CATV in the major markets was "an eminently reasonable course,"[42] and we perceive nothing in this case to suggest that such a technique became unreasonable here.

█ We likewise regard the Commission's distant signal rule[43] as fully consistent with its past policy of encouraging the wholesome growth of UHF broadcasting. We deem this to be so

notwithstanding that cases outside its reach are not set for hearing automatically,[44] for these cases too are put through an investigatory hearing if they involve a substantial issue affecting the public interest in UHF.[45] When it is considered that the Commission exercised selectivity regarding hearings on claims of undue VHF encroachment on UHF,[46] what the Commission does now does not differ essentially from what it did before. Moreover, when the threat of CATV arose, a full scale rule-making proceeding was conducted at the outset, the problem was refined, and standards were established against which charges of injurious CATV intrusion could be measured. These considerations logically and easily justify the relatively small differences to which one might point between the present procedures and those of the past.

## II

█ While, as we have stated, the Commission's rules command an evidentiary hearing only where a distant signal is introduced into a station's Grade A territory,[47] and although intervenors' CATV systems will not penetrate WANE-TV's Grade A contour, petitioner argues that the case should be treated as if they would. Its chief reason is that intervenors' services would reach inside the Grade A contour of a hypothetical VHF station operating with maximum facilities from Fort Wayne because, we understand, the Grade A contour of a VHF station extends much

---

37. *Id.* at 764, 881–83. See also Buckeye Cablevision, Inc. v. FCC, *supra* note 30, 387 F.2d at 224; Channel 9 Syracuse, Inc. v. FCC, *supra* note 7, 385 F.2d at 971 (1967). Compare National Broadcasting Co. v. United States, 319 U.S. 190, 218, 224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

38. 47 C.F.R. § 74.1107(a) (1968), quoted *supra* note 6.

39. 47 C.F.R. § 74.1107(c) (1968), quoted *supra* note 9.

40. *Supra* note 30.

41. 387 F.2d at 224.

42. *Id.* at 224. See also Cedar Rapids Television Co. v. FCC, 128 U.S.App.D.C. 270, 387 F.2d 228 (1967); Channel 9 Syracuse, Inc. v. FCC, *supra* note 7.

43. 47 C.F.R. § 74.1107(a) (1968), quoted *supra* note 6.

44. See note 9, *supra*, and related text.

45. *E. g.*, In re Taft Broadcasting Co., 5 F.C.C.2d 746 (1966); In re Midwest Television, Inc., 4 F.C.C.2d 612 (1966).

46. *E. g.*, In re Video Utility Corp., 25 R.R. 851 (1963).

47. See notes 6–9, *supra*, and accompanying text.

further than the Grade A contour of a UHF station. Thus, were Fort Wayne not an all-UHF market, the Commission would automatically have convened a hearing at which petitioner might have aired its views.

The Commission declined to adopt petitioner's litigative approach. "[T]his argument," it said, "is in reality an attempt to employ a fixed mileage standard in top 100 cases, and we have rejected this approach in the *Second Report and Order*, where our reasons are set forth. We reject it here for the same reasons." [48] We think the Commission remained on safe ground in doing so.

In its *Second Report and Order*, the Commission decided on virtually mandatory hearings for the cases embraced by its distant signal rule, and for other cases, on hearings on the basis of substantially-supported factual allegations of potential harm to the public interest.[49] The line of demarcation is thus drawn in particular cases according to whether there will be CATV activity inside the Grade A contour of a station operating in one of the top 100 markets.

The Commission, also in its *Second Report and Order*, elaborately supported each of the twin elements comprising the distinguishing criterion. It employed the Grade A contour because, despite individual differences in site and equipment, stations in a given market tend over a period of time toward approximation in their Grade A service areas.[50] The Grade A contour also encompasses the essential area upon which new UHF operations in the market are likely to be based, and possesses the advantage of definiteness and ease of administration.[51]

With similar clarity, the Commission articulated the considerations which led to its adoption of the top-100-market component in its standard for automatic hearings. Embracing about 90 percent

---

48. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 644. On this basis, the Commission concluded identically as to Shardco. In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 72.

49. See notes 6–9, *supra*, and accompanying text.

50. "We have employed the grade A contour of any station since, while stations often are located at different sites or have different powers or heights (and thus different A contours), these grade A service areas in the same market have a tendency of becoming fairly close to one another over a period of time. In any event, we think that this is an appropriate criterion since it encompasses the essential area upon which new UHF broadcast operations in the market would be based, without including the much larger areas falling within the grade B contours, as has been urged by some in this proceeding. Because our effort is to carve out such an essential area upon which new UHF development would be vitally based, we have employed the predicted grade A contour; use of the predicted contour should also have the advantage of definiteness and easier administration. In the unusual instance where the requirement may be inappropriate, waiver can be sought." *Second Report and Order*, 2 F.C.C.2d at 783 n. 63 (1966).

51. *Id.* at 783 n. 63. The *Second Report and Order* was later reconsidered by the Commission and the Grade A contour standard embodied in § 74.1107 of the regulations was retained. The Commission then said: "[The Grade A contour] does not include the much larger areas falling within the grade B contour, as requested by some of the petitioners for reconsideration. Nor is it limited to the immediate environs of the principal community, as sought by others. But the grade A contour generally carves out the essential area upon which UHF operations in the market would usually be based. We recognize that the grade A contour may encompass some localities where, because of the particular circumstances, an evidentiary hearing appears unnecessary. We have already granted waivers of the hearing requirement in some instances. No standard suggested to us would precisely fit all the situations we are seeking to reach, to the exclusion of all others. The use of the grade A contour, coupled with the procedures for waiver, insures that all proposed distant-signal CATV operations in the area of apparent reasonable concern are brought before us for consideration and such action as may be warranted in the public interest in the particular circumstances." CATV Regulation, 6 F.C.C.2d 309, 318–319 (1967).

of the Nation's television homes, those markets are the critically important localities wherein both UHF and CATV are most likely to flourish.[52] The problems in other markets are different, and require different procedures, because they are served, if at all, by fewer stations, and these are usually network-affiliated rather than independent, and because if they are unserved CATV can make its most important contribution.[53] Hearings in these smaller communities could unduly burden both the UHF

broadcaster and the CATV operator, and frustrate the initiation of needed television service.[54]

 Finding, then, as we do, a reasonable basis for the Commission's standard, we sustain its distant signal rule and the limitations with which it surrounds automatic hearings.[55] And once again we remind that it is not incumbent upon the Commission to reexamine individual cases *de novo* to determine whether a lawful administrative standard should be applied.[56] "[Q]ues-

52. "We have selected the top 100 markets for special attention because it is in these markets that UHF stations or wire pay-TV based upon CATV operations are most likely to develop and therefore the problems raised are most acute. Further, as noted, any delay in commencement of CATV operation because of the necessity for evidentiary hearings is mitigated by the consideration that these markets generally have a considerable amount of presently available and prospective new service. Finally, the top 100 markets include roughly 90 percent of the television homes in this country. Our policy therefore focuses on the critically important areas." Second Report and Order, 2 F.C.C.2d at 783.

53. "Admittedly, there can be substantial problems affecting the public interest where the CATV system proposes to extend the signals of broadcast stations beyond the grade B contour into areas below the top 100 markets. But there are differences between the two situations which call for different procedures. In markets below the top 100, the independent UHF (or VHF) station is much less likely to develop; the stations in such markets are apt to be three or less in number and network affiliated. This means, in turn, that the non-duplication provision is effective (since network programing will be significantly involved), and protection of a station's network programing should contribute very substantially to insuring its continued viability. It would appear that network programing will continue to be available in such markets; in the unlikely event that such programing becomes unavailable because of CATV impact, there would appear to be other appropriate remedial action which can be taken. Further, it is in the markets below 100 that there may be underserved areas where CATV can make its most valuable and traditional contribution.

Indeed, the market division which we adopt is really a division between CATV in its traditional sense and the new, revolutionary facet of CATV, as posed by its entry into the major markets. It is the latter which peculiarly requires the most thorough examination in the context of an evidentiary hearing." *Id.* at 783.

54. "We think, therefore, that a fair compromise is to draw the line as to special attention (i. e., evidentiary hearings) at the 100th market, and below that point, simply to take such action as may be necessary in the public interest, upon appropriate petitions bringing substantial questions to our attention. * * * We shall not necessarily hold evidentiary hearings in connection with such petitions in the smaller markets. Such hearings could be a considerable burden both upon the CATV operation and the broadcaster in these small communities. * * * Indeed, the hearing might thwart the initiation of needed service. Therefore, while hearings might be held in some instances, we have devised flexible procedures generally to treat expeditiously petitions or requests involving the markets below 100, since we recognize that to hold hearings upon each such petition or request might be burdensome to all parties involved and to the public." *Id.* at 783–784.

55. Compare National Broadcasting Co. v. United States, *supra* note 37, 319 U.S. at 224–225, 63 S.Ct. 997; Goodwill Stations, Inc. v. FCC, 117 U.S.App.D.C. 64, 71, 325 F.2d 637, 644 (1963); Fort Harrison Telecasting Corp. v. FCC, 116 U.S.App.D.C. 347, 352, 324 F.2d 379, 384 (1963), cert. denied Sangamon Valley Television Corp. v. United States, 376 U.S. 915, 84 S.Ct. 665, 11 L.Ed.2d 611 (1964); Coastal Bend Television Co. v. FCC, 98 U.S.App.D.C. 251, 255, 234 F.2d 686, 690 (1956).

56. FPC v. Texico, Inc., 377 U.S. 33, 44, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351

tions of such a highly technical and scientific nature must, after legal and required administrative proceedings, be left to administrative expertise. Congress has vested the Commission with primary jurisdiction to determine questions of this type, and we believe our judicial function is completed when our review establishes that the parties have received their full legal rights and the Commission's findings and rulings are neither arbitrary nor capricious." [57]

### III

■ Petitioner further opposed the CATV projects in suit on the broad ground that they would adversely affect the development of UHF broadcasting in the Fort Wayne area by weakening economically the existing UHF stations therein and by discouraging interest in utilization of the available Fort Wayne commercial channel. Since the projects were beyond the scope of the distant signal rule, it was incumbent upon petitioner, to qualify the cases for an evidentiary hearing, to "state fully and precisely all pertinent facts and circumstances relied upon to demonstrate the need for the relief requested and to support a determination that a grant of such relief would serve the public interest." [58] The Commission held that petitioner's presentation was substantively inadequate to meet these requirements [59] and, finding ample support in the record for that conclusion, we uphold the Commission's dispositions.

The record contains uncontested data, supplied largely by petitioner, which glare in the backdrop against which its claims are to be viewed. WANE-TV's Grade B contour covers 5,450 square miles inhabited by 564,996 persons. This area includes, of course, its smaller Grade A contour which circumscribes 2,335 square miles in which 360,184 people live. Fort Wayne with a population of 161,776, and the surrounding Allen County with a population of 232,196, lie wholly within WANE-TV's Grade A contour.

In the region between WANE-TV's Grade A and Grade B contours, upon which this litigation focuses, there are 204,812 residents. These constitute less than 35 percent of the total population within WANE-TV's service area. Angola and Delphos, both lying beyond the Grade A contour, have a combined population of but 11,707—less than six percent of the total between WANE-TV's Grade A and Grade B contours, and less than three percent of the total population within its service area.

Petitioner alleged that importation of distant signals into Angola and Delphos would diminish its revenues and, consequently, its programming service but, as the Commission found, its backup materials did not forecast these consequences.[60] The record revealed that since 1959 television broadcasting in the Fort Wayne market has been a profitable venture; in 1965, the total broadcast revenues for the three Fort Wayne stations aggregated more than $3,000,-000 and their total net income exceeded $600,000. The record also disclosed that Angola and Delphos in combination have but 3,500 television homes, only about half of which could be expected to become CATV subscribers. It is easy to see why the Commission had difficulty in understanding, without a factual elucidation by petitioner, how the small operations intervenors propose could in-

U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); National Broadcasting Co. v. FCC, 124 U.S.App.D.C. 116, 125, 362 F.2d 946, 955 (1966).

57. National Broadcasting Co. v. FCC, supra note 56, 124 U.S.App.D.C. at 125–126, 362 F.2d at 955–956. See also National Broadcasting Co. v. United States, supra note 37, 319 U.S. at 224, 63 S.Ct. 997.

58. 47 C.F.R. § 74.1109(c) (1968).

59. In re GT&E Communications, Inc., supra note 1, 6 F.C.C.2d at 644–45; In re Shardco Cablevision, Inc., supra note 1, 8 F.C.C.2d at 72–73.

60. In re GT&E Communications, Inc., supra note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., supra note 1, 8 F.C.C.2d at 73.

flict serious financial injury on petitioner or other UHF broadcasters in the area.

And petitioner produced little indeed to explicate its contentions.[61] It did not undertake a factual demonstration of anticipated revenue losses from network operations, and its showing with respect to local advertising on its broadcasts was vague and unconvincing. Beyond that, it is apparent, as the Commission pointed out,[62] that its nonduplication rule [63] would provide substantial protection for the network signals that petitioner itself broadcasts, and that its carriage rule [64] would project petitioner's programs via intervenors' CATV systems into Angola and Delphos. And petitioner's largely unsupported allegations of a threat of losses from local advertising hardly evinced a basis for such concern that the Commission was compelled to examine them further.

Nor can we quarrel with the Commission's rejection of petitioner's plea that intervenors' systems would chill interest in the commercial channel still available in Fort Wayne.[65] No applicant for that assignment had come forward.[66] More importantly, Angola and Delphos together comprise but a puny fraction of the Fort Wayne market; and both are outside the Grade A contours of all three Fort Wayne stations, and Delphos is beyond the Grade B contour of two of them. Nothing in petitioner's administrative presentation augured an identifiable expectation that any new UHF entrant in the area would look toward these two small communities for essential support.

The main thrust of petitioner's arguments—both before the Commission and here—is to be found in their predictions as to the cumulative effect of growing CATV service on future UHF broadcasting from Fort Wayne. Adverting to CATV applications, granted or pending, between WANE-TV's Grade A and Grade B contours,[67] petitioner tells us, as in substance it told the Commission, that "[w]hat is needed is a single area-wide evidentiary hearing as a result of which there can be resolved once and for all the serious issues raised by potential CATV operations throughout the market." In dealing with its request, the Commission marked out and gave consideration to WANE-TV's Grade A and Grade B service territories as separate areas of concern. Applications seeking inauguration of CATV services within WANE-TV's Grade A contour, the Commission said, would involve the distant signal rule,[68] and thus would reasonably assure a hearing.[69] For this reason, the

61. Cf. Interstate Broadcasting Co. v. FCC, 109 U.S.App.D.C. 190, 192, 285 F.2d 270, 272 (1960), where the allegations were "factual" and "specific."

62. In re GT&E Communications, Inc., supra note 1, 6 F.C.C.2d at 644; In re Shardco Cablevision, Inc., supra note 1, 8 F.C.C.2d at 73.

63. 47 C.F.R. §§ 74.1103(e)–(f) (1968). This rule preserves program exclusivity for stations providing Grade B or better service to a community with respect to lower priority or more distant duplicating signals.

64. 47 C.F.R. § 74.1103(a) (1968). This rule requires all CATV systems to carry, without material degradation, the signals of all television stations providing Grade B or better service to the community in which the CATV system operates.

65. In re GT&E Communications, Inc., supra note 1, 6 F.C.C.2d at 644; In re

Shardco Cablevision, Inc., supra note 1, 8 F.C.C.2d at 72.

66. And no application had been filed for a second UHF channel in Lima, Ohio, the only other allocated commercial UHF channel that could serve either Angola or Delphos, nor did it appear that an applicant therefor would need special protection because of inability to obtain a network affiliation. Compare Cedar Rapids Television Co. v. FCC, supra note 42, 387 F.2d at 231–32.

67. It appears that only one CATV system is now operating in the Fort Wayne area, and that it is outside WANE-TV's Grade A contour. It seems also that there has been no application for CATV within its Grade A contour.

68. 47 C.F.R. § 74.1107(a), quoted in relevant part supra note 6.

69. As petitioner points out, such a hearing can be waived, but only when justified in

Commission felt that CATV activity therein "need not be counted here in considering cumulative impact." [70] Looking next to CATV activity in the area between WANE-TV's Grade A and Grade B contours, the Commission deemed it too inconsequential to raise any issue of substantial impact on WANE-TV.[71]

Petitioner's statistics listed "CATV activity" in six communities, all outside WANE-TV's Grade A contour, with a combined population of 36,134—less than seven percent of the total population within WANE-TV's service area. Petitioner supplied no information as to the number of homes served by CATV, nor as to the extent to which the local CATV franchises were granted or pending. And as the Commission noted, any repercussions from these CATV systems in actual operation would be substantially dampened by virtue of the Commission's carriage [72] and nonduplication [73] requirements. We think that in these circumstances the Commission could properly conclude that petitioner had not shown such a threat from a CATV pattern larger than the two involved proposals as would merit inquiry in the context of an evidentiary hearing.

This case is not essentially dissimilar to Cedar Rapids Television Company v. Federal Communications Commission [74] wherein we upheld the Commission's refusal to grant a hearing on a proposal to add additional distant signals to an ongoing CATV system within the Grade B territory of a VHF station. The arguments there, like those here, extended to deterrence of UHF development [75] and cumulative economic impact from CATV activity,[76] and the Commission found them lacking in the same specifics absent here.[77] There, too, like here, no UHF expansion was in the offing,[78] and the Commission found no "concrete threat" [79] posed by an anticipated accumulation of CATV operations. There we held, as here we reaffirm, that "the Commission could reaonably require some evidence of reduced revenues or lost advertising, and of the nature of the CATV operations" [80] before embarking upon an evidentiary hearing. And, as in *Cedar Rapids,* "[w]e can find no basis for concluding that the Commission's construction of the distant-signal rules is 'plainly erroneous or inconsistent with' the rules themselves," so "the Commission's interpretation is entitled to 'controlling weight.' " [81]

We are mindful of the problems the burgeoning CATV industry is presenting for television broadcasting, and the burdens incidental to full scale evidentiary hearings in a constantly increasing number of CATV applications, but it is primarily for the Commission to make the adjustment. The question is not what

the circumstances of the case. We recently adverted to the need for "factual specificity in petitions for waiver and in the proof," and for Commission adjudications that "clearly articulate the public interest considerations on which it determines to waive." Channel 9 Syracuse, Inc. v. FCC, *supra* note 7, 385 F.2d at 975. Importantly involved in our decision there was the fact that appellant did not controvert factual allegations in a request for waiver which, though leaving something to be desired, were nevertheless suficient as a basis for the waiver sought.

70. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73.

71. In re GT&E Communications, Inc., *supra* note 1, 6 F.C.C.2d at 645; In re Shardco Cablevision, Inc., *supra* note 1, 8 F.C.C.2d at 73.

72. See note 64, *supra.*

73. See note 63, *supra.*

74. *Supra* note 42.

75. 387 F.2d at 231–232.

76. *Id.* at 231, 232.

77. *Id.* at 231–232.

78. *Id.* at 231.

79. In re Dubuque TV-FM Cable Co., 6 F.C.C.2d 564, 566 n. 4 (1967), aff'd sub nom. Cedar Rapids Television Co. v. FCC, *supra* note 42.

80. Cedar Rapids Television Co. v. FCC, *supra* note 42, 387 F.2d at 232.

81. *Id.* at 230, quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

we ourselves might be inclined to do, but whether what the Commission has done accords well with entrenched standards by which administrative action is tested judicially.[82] We think that in this case it does.

Affirmed.

---

**82.** *E. g.*, National Broadcasting Co. v. FCC, *supra* note 56, 124 U.S.App.D.C. at 125– 126, 362 F.2d at 955–956, quoted in text *supra* at note 57.