NATIONAL ASSOCIATION OF THEATRE OWNERS and Joint Committee Against Toll TV, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Zenith Radio Corporation and Teco, Inc., Intervenors.

No. 22623.

United States Court of Appeals District of Columbia Circuit.

Argued June 9, 1969.

Decided Sept. 30, 1969.

Certiorari Denied Feb. 24, 1970.
See 90 S.Ct. 914.

Mr. Marcus Cohn, Washington, D. C., with whom Mr. Martin J. Gaynes, Washington, D. C., was on the brief, for petitioners.

Mr. Daniel R. Ohlbaum, Deputy General Counsel, with whom Mr. Henry Geller, General Counsel, and Miss Katrina Renouf, Counsel, Federal Communications Commission, were on the brief, for respondent Federal Communications Commission. Mr. John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered appearances for respondent Federal Communications Commission.

Mr. Howard E. Shapiro, Washington, D. C., was on the brief, for respondent United States of America.

Mr. Harold David Cohen, Washington, D. C., with whom Messrs. W. Theodore Pierson and Vernon C. Kohlhaas, Washington, D. C., were on the brief, for intervenors.

Before TAMM, LEVENTHAL and ROBB, Circuit Judges.

TAMM, Circuit Judge:

■ Today we are faced with a question of national importance, *id est,* whether the Federal Communications Commission possesses the requisite power to authorize nationwide over-the-air subscription television [1] (commonly referred to as "pay TV") on a permanent basis. For the reasons hereinafter stated, we hold that the Commission can authorize such a service under the authority conferred upon it by the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U.S.C. §§ 301–397 (1964), and that the Commission acted properly in prescribing rules for the development of this new service.

## I. PROCEDURAL HISTORY

The history of the Commission's involvement with subscription television (hereinafter STV) is indeed lengthy. Nearly two decades ago, on February 25, 1952, the Zenith Radio Corporation filed a petition with the Federal Communications Commission requesting authority

---

1. Over-the-air subscription television differs from conventional broadcasting in the nature of the signal that is transmitted; a subscription station broadcasts a "scrambled" signal that can be converted to intelligible form by special equipment which also assesses charges for the subscription programs viewed. CATV systems with direct cable links to subscribers' television sets are also technically capable of using similar devices to offer subscription services. The Federal Communications Commission investigated the possibility of authorizing subscription services on CATV networks, and concluded that the most efficient means of establishing pay television at present was through broadcasting stations. *See* Fourth Report and Order on Subscription Television, 15 F.C.C.2d 466, 579–587 (1968) [hereinafter *Fourth Report*].

to institute a subscription television service.[2] On February 10, 1955, the Commission issued a Notice of Proposed Rulemaking, 20 Fed.Reg. 988, in which it requested comments from interested parties on the question of whether the Commission had the statutory power to authorize such operations. After voluminous responses to this inquiry were filed, the Commission released a Notice of Further Proceedings, 22 Fed.Reg. 3758 (1957), in which it announced that trial demonstrations of STV would be necessary before a final decision could be made. Shortly thereafter, on October 17, 1957, the Commission issued its *First Report* on subscription television, 23 F.C.C. 532, which concluded that the Commission could authorize pay television, but that trial operations should be conducted first. At this point Congress began to take notice of the problem, and the House Committee on Interstate and Foreign Commerce conducted hearings on the subject. Upon conclusion of these hearings, the Committee passed a resolution requesting the Commission to defer authorization of any STV operations. *See* 16 P&F Radio Reg. 1539–1540 (1958). The Commission then issued its *Second Report* [3] on pay television which suspended the processing of all STV applications until the expiration of the 85th Congress; this delay was subsequently extended through the 86th Congress.

In 1959 the Commission issued its *Third Report* on subscription television, 26 F.C.C. 265, 16 P&F Radio Reg. 1540a, in which it reasserted the conditions for trial operations set out in the *First Report*. In addition, the *Third Report* stated that as soon as the trial operations provided sufficient data, public hearings would be held to determine whether STV should be authorized on a permanent basis. Pursuant to the *Third Report*, three applications were

filed for trial STV operations; only one such station ever commenced operations, however.[4] This station, which was operated by Zenith Radio Corporation and its licensee Teco, Inc.,[5] intervenors in this action, began broadcasting over UHF station WHCT in Hartford, Connecticut during 1962. This operation was initially licensed for three years, but the license was subsequently extended for an additional three years in 1965; in 1968 it was again extended for three years, or until such time as the Commission authorized STV on a permanent basis. The Commission's authority to license the trial operation was approved by this court in Connecticut Committee Against Pay TV v. FCC, 112 U.S.App. D.C. 248, 301 F.2d 835, cert. denied, 371 U.S. 816, 83 S.Ct. 28, 9 L.Ed.2d 57 (1962).

In 1965 Zenith and Teco jointly filed a petition for further rulemaking to establish permanent nationwide STV on the basis of the data derived from their trial operation in Hartford. The Commission then issued, in 1966, a Further Notice of Proposed Rulemaking and Notice of Inquiry, 31 Fed.Reg. 5136, 7 P&F Radio Reg.2d 1501, which, in essence, requested further comments on the feasibility of nationwide STV. Subsequently, in 1967, the FCC's Subscription Television Committee submitted to the Commission a *Proposed Fourth Report,* 10 P&F Radio Reg.2d 1617 (1967); the FCC, *en banc,* invited comments and held oral argument on the proposed report.

After the issuance of the *Proposed Fourth Report,* which concluded that the Federal Communications Commission did have statutory power to authorize permanent nationwide STV, the Communications and Power Subcommittee of the House Interstate and Foreign Com-

---

2. 20 Fed.Reg. 988 n.1 (1955).

3. 16 P&F Radio Reg. 1539 (1958).

4. One of the three applications was denied; of the two which were granted, one station relinquished its license before commencing operations. Fourth Report, 15 F.C.C.2d at 467.

5. Zenith has patented "Phonevision," a system for over-the-air subscription television, and has licensed Teco to enfranchise local Phonevision operations. Brief for the Intervenors at 2 n.1.

merce Committee conducted hearings on the subject of STV during the week of October 9, 1967. Upon conclusion of these hearings the full Committee recommended that the Commission refrain from taking any action for one year or until the Communications Act of 1934 was amended to authorize subscription television. *See* 15 F.C.C.2d at 466, 470. On September 3, 1968, the Commission, through Chairman Hyde, sent a letter to Chairman Staggers of the House Committee on Interstate and Foreign Commerce indicating that the Commission could not delay any further in resolving the important question of STV authorization.[6] The Commerce Committee responded on September 11, 1968, by adopting a resolution announcing that it was "the sense of the Committee" that the Commission should delay action on STV "until the end of the first session of the 91st Congress" or until "completion of action on legislation if by the end of said first session legislation pertaining to * * * [STV] is under consideration." The resolution went on to state that "it is the further sense of this committee that to avoid any further delay * * * hearings * * * should be scheduled by the end of May 1969." 15 F.C.C.2d at 471.

Finally, on December 12, 1968, the Commission issued its *Fourth Report* on subscription television, 15 F.C.C.2d 466, in which it reaffirmed its earlier conclusion that it possessed the power to authorize a permanent nationwide system of STV and established rules governing the operation of that system. The National Association of Theatre Owners and the Joint Committee Against Toll TV, participants in the Commission proceedings, filed a petition for review in this court pursuant to section 402 of the

Communications Act, 47 U.S.C. § 402 (1964), alleging statutory and constitutional errors in the Commission's determinations.

## II. THE FOURTH REPORT

The Commission's *Fourth Report and Order* is a lengthy (144 pages) and carefully reasoned document which surveys the potential advantages and disadvantages of subscription television in light of the Hartford experiment and the contentions of various parties interested in pay television. On the basis of its seventeen-year inquiry into STV, the Commission concluded that subscription television would provide a "beneficial supplement" to conventional "free" broadcasts [7] in the sense that STV broadcasting "is not duplicative of the programming of free TV and that [it] is desired or needed by at least a portion of the viewing public." 15 F.C.C.2d at 473 n.20; *see also id.* at 483–488. In considering the critical question of whether STV would have substantial adverse impact on free television, the Commission placed primary emphasis on the possibility that programs, audiences, and talent would be diverted ("siphoned") from free television to STV. Because the Commission recognized that the public's "tremendous investment * * * in television receivers based on the expectation of free service ought to be protected and the millions of viewers who rely on that service for free entertainment should be permitted to do so," it imposed a number of restrictions on STV operations. In brief, the Commission provided that STV stations could be established only in communities located entirely within the Grade A contours of five or more commercial broadcast stations, and that only one STV station

---

6. Fourth Report, 15 F.C.C.2d at 470–471.

7. There is some question whether the term "free TV" is a misnomer; in the Fourth Report, for example, the Commission stated: "[F]ree TV is not really free. The advertising costs which support free TV are eventually passed on to the public, and a profit is made by the licensee or others

from the use of the public's channels." 15 F.C.C.2d at 548; *but cf. id.* at 548 n.51; Brief for Petitioners at 39: "[E]conomists have contended that free television is indeed 'free' because, as more and more units of a particular commodity are sold, the purchase price goes down and the advertising costs are borne not by the public, but by the results of mass production."

could be located in each such community; that each STV station must broadcast at least twenty-eight hours per week of free programming; and that STV stations must observe detailed restrictions on the kind and quantity of subscription programs broadcast in order to prevent "siphoning." *See* 15 F.C.C.2d at 494–495, 515–523, 595, 597, 598; *see also* pt. IVB, *infra*. Rules were also established governing the technical specifications and *modus operandi* of STV stations; *see* 15 F.C.C.2d at 544–548, 595–598. In promulgating these restrictions, the Commission attempted to strike a balance between the danger of allowing STV operations to acquire enough economic power to destroy free broadcasting, and the risk of hedging the new service with so many restrictions that it would "smother" before it ever got started. Thus, the Commission rejected the suggestion, urged by petitioners and others, that direct regulation of the rates charged by STV stations was necessary in order to prevent "gouging" of the public; instead, it concluded that the available evidence rendered this possibility remote, and that free market forces would be a sufficient check on the prices charged for STV services. (*Id.* at 526, 548.) We hold that the Commission acted reasonably and within the scope of its authority, both in making its initial decision to authorize permanent nationwide STV and in imposing specific regulations governing subscription television.

## III. THE COMMISSION'S POWER TO AUTHORIZE SUBSCRIPTION TELEVISION

The petitioners advance three arguments in support of their contention that the Commission exceeded the proper bounds of its power in authorizing nationwide subscription television. First, they assert that the Communications Act contains no explicit grant empowering the Commission to allow direct charges on the public for broadcast services, and that no such power can be inferred from the language or history of the Act (Brief for Petitioners at 17–21). Second, petitioners contend that the Commission lacks authority to regulate the rates charged for broadcast services, and that the absence of such authority is persuasive evidence of Congress' intent to preclude establishment of direct-charge broadcast operations such as STV (Brief for Petitioners at 21–24). Finally, petitioners claim that even if the Commission did have the necessary authority to establish pay television, its failure to regulate rates or to decide the question of whether it possessed rate-making power constituted an arbitrary and capricious exercise of this authority (Brief for Petitioners at 35–43). We shall consider each of these contentions separately.

### A. The Language and History of the Communications Act

Our inquiry into the scope of the Commission's authority begins with section 303 of the Communications Act of 1934, 48 Stat. 1082, as amended, 47 U.S.C. § 303 (1964), which sets forth the Commission's general powers and duties in regulating radio broadcasting. In pertinent part, this section directs the Commission, "as [the] public convenience, interest, or necessity requires," to:

(a) Classify radio stations;

(b) Prescribe the nature of the service to be rendered by each class of licensed stations * * *;

* * * * * *

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station * * *;

* * * * * *

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest.

In addition, section 307(a) of the Act, 47 U.S.C. § 307(a) (1964), provides that "[t]he Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license * * *."

We find it unnecessary to determine the precise significance as precedent of our ruling in Connecticut Committee Against Pay TV v. FCC, 112 U.S.App. D.C. 248, 301 F.2d 835, cert. denied, 371 U.S. 816, 83 S.Ct. 28 (1962). *Connecticut Committee,* which arose out of the same series of proceedings as this litigation,[8] dealt with the propriety of Commission authorization for a *trial* STV operation, and our opinion placed considerable emphasis upon the experimental nature of the undertaking.[9] Thus, although *Connecticut Committee* can provide assistance in our present inquiry, we feel it appropriate to give fresh consideration to the question of whether the Federal Communications Commission has authority to license STV for an indefinite period.

The basic structure of title III of the Communications Act, from which the foregoing sections are quoted, is a broad grant of general licensing authority to the Commission, subject to a number of specific exceptions and limitations. (*See e. g.,* 47 U.S.C. §§ 310, 312, 313(b) (1964).) This plan is consistent with the dynamic and rapidly-changing nature of the statute's subject matter, radio broadcasting, and the courts have consistently recognized that Congress intended to vest expansive powers in the Commission in order to avoid the necessity of repetitive legislation.[10] The classic affirmation of the broad scope of the Commission's authority was enunciated nearly thirty years ago by the Supreme Court in National Broadcasting Company v. United States:

In the context of the developing problems to which it was directed, the Act gave the Commission not niggardly but expansive powers. It was given a comprehensive mandate to "encourage the larger and more effective use of radio in the public interest" * * *.

* * * While Congress did not give the Commission unfettered discretion to regulate all phases of the radio industry, it did not frustrate the purposes for which the Communications Act of 1934 was brought into being by attempting an itemized catalogue of the specific manifestations of the general problems for the solution of which it was establishing a regulatory agency. That would have stereotyped the powers of the Commission to specific details in regulating a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding.[11]

This continuing imperative need for an expansive interpretation of the Commission's jurisdiction was recently reaffirmed by the Supreme Court in United States v. Southwestern Cable Co., 392 U.S. 157, 167–178, 88 S.Ct. 1994, 20 L. Ed.2d 1001 (1968), and has been ob-

8. *See* part I, *supra.*

9. In his opinion for the court, Judge (now Chief Justice) Burger pointed out that "Congress specifically commanded the Commission by Sec. 303(g) of the Communications Act, to 'study *new uses* for radio, *provide for experimental uses of frequencies,* and generally encourage the larger and more effective use of radio in the public interest.'" (Emphasis in original.) In addition, he concluded that "[t]he distinguishing characteristic of the Federal Communications Commission's authorization of subscription television in this case is the experimental or trial basis upon which the system is to operate for the duration of its three years authority." 112 U.S.App.D.C. at 250, 301 F.2d at 837.

10. *See* General Telephone Company of California v. FCC, 134 U.S.App.D.C. 116, at 124, 413 F.2d 390, at 398 (1969):
Over the years, the Commission has been required to meet new problems * * * and as cases have reached the courts the scope of the Act has been defined, as Congress contemplated would be done, so as to avoid a continuing process of statutory revision. To do otherwise in regulating a dynamic public service function such as broadcasting would place an intolerable regulatory burden on the Congress—one which it sought to escape by delegating administrative functions to the Commission.

11. 319 U.S. 190, 219, 63 S.Ct. 997, 1011, 87 L.Ed. 1344 (1943); *see also* FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 137–138, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

served repeatedly by this court.[12] Moreover, the Commission has devoted long and careful scrutiny to the question of whether it possesses authority to license STV operations, and has reached the conclusion that its jurisdiction under the Act is sufficient.[13] In this situation, we are bound to observe the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); *see also* General Telephone Company of California v. FCC, 134 U.S.App. D.C. 116 at 127, 413 F.2d 390, 401 (1969).

Notwithstanding this impressive body of authority, the petitioners contend that STV is clearly beyond the contemplation of the Communications Act. In essence, they assert that "over-the-air pay television represents a fundamental change in the nature of American Broadcasting" (Brief for the Petitioners at 13) and that therefore the power to license pay television cannot be inferred from the Act. Direct charges for broadcasting services are not wholly unprecedented in this country, however; testimony to this fact may be found in Functional Music, Inc. v. FCC, 107 U.S.App.D.C. 34, 274 F.2d 543 (1958), cert. denied, 361 U.S. 813, 80 S. Ct. 50, 4 L.Ed.2d 81 (1959), and Muzak

Corp., 8 F.C.C. 581 (1941). Indeed, we referred to these cases in *Connecticut Committee* as instances in which subscription services "have been found perfectly acceptable by both [the] Commission and the courts." 112 U.S.App. D.C. at 250 n.2, 301 F.2d at 837 n.2. Since the matter now before us is basically a question of first impression,[14] however, we have examined the legislative history of the Communications Act in order to evaluate petitioners' claim that subscription television is "the most fundamental change in broadcasting that has occurred since the adoption of the original Communications Act in 1927" (Brief for the Petitioners at 20).

The present statute governing the Commission's authority over broadcasting services is derived in large part from the Radio Act of 1927, 44 Stat. 1162.[15] Five years before the Radio Act was adopted, the problem of how radio broadcasts would be financed was still very much an open question. Proposals included endowment of stations by public-spirited citizens, municipal or state financing, donations from the listening public, and taxes on the sale of radio receivers; some variants of these schemes were attempted with limited success in the years preceding the Radio Act's passage.[16] The concept of advertiser-financed programs apparently was first developed on a systematic basis [17] by the American Tele-

12. *See, e. g.,* Paducah Newspapers, Inc. v. FCC, 134 U.S.App.D.C. 287, 414 F.2d 1183 (1969); General Telephone Company of California v. FCC, 134 U.S. App.D.C. 116 413 F.2d 390 (1969); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967).

13. *See* Fourth Report, 15 F.C.C.2d at 469–473; First Report on Subscription Television, 23 F.C.C. 532, 535–542 (1957).

14. Aside from *Connecticut Committee,* the *Functional Music* case parallels the facts of the instant controversy more closely than any other case which we have been able to discover. In *Functional Music,* however, we did not deal with the specific question of the FCC's authority to license direct-charge broadcasting services. The major issues in that case were whether this court possessed jurisdiction to review the Commission's action, and whether the Commission had erred in determining that functional broadcasting was point-to-point communication rather than broadcasting under the Act.

15. For a brief description of the early federal statutes governing broadcasting, *see* National Broadcasting Co. v. United States, 319 U.S. 190, 210–214, 63 S.Ct. 997 (1943).

16. *See* E. Barnouw, A Tower in Babel: A History of Broadcasting in the United States 154–157 (1966) [hereinafter Barnouw]; G. Archer, History of Radio to 1926, at 252–254 (1938) [hereinafter Archer].

17. Apparently some sporadic efforts at radio advertising were made in the early 1920's when individual phonograph record

phone and Telegraph Company in 1922, as part of a plan which the company called "toll broadcasting";[18] initial public reaction to this system has been described as "lukewarm, and in some cases indignant."[19] Various forms of advertising soon became a commonplace adjunct of radio programs,[20] however, and in spite of occasional public and official attacks on the practice[21] it had become a well-established—but hardly universal—[22] method of financing radio programs by 1927 when congested air waves led Congress to establish detailed federal regulation of broadcasting.

Given this rather chaotic background, it is not surprising that the legislative history of the Radio Act casts little light on the precise question presented by this case. An early version of the Act, which was passed by the Senate, gave the regulatory body power to "regulate radio stations where a charge is made to listeners,"[23] but this provision was subsequently deleted in conference without explanation.[24] The problem of authority to license direct-charge broadcasting was mentioned only briefly on several occasions during the floor debates on the Radio Act. The most extensive discussion of the question was offered by Senator Dill, sponsor of the Senate bill and Chairman of the Conference Committee:

Mr. WALSH of Massachusetts. A Representative from New York has introduced in the House a bill to prevent a radio-broadcaster from charging the public for listening in. It is claimed that the possible result of this legislation may be the charging of a fee to listeners * * *. Is there any provision in this bill that permits that to be done?

Mr. DILL. * * * [T]he commission would have the power to permit or prohibit the use of such apparatus if it so desired, but * * * in my judgment, Congress should not pass a law that would prevent a broadcasting station from so equipping itself that people could not listen to its programs unless they had a certain kind of receiving set.

\* \* \* \* \* \*

* * * [H]ere in the United States we have built up a free system of broadcasting and reception, and it has thrived * * *. I do not believe,

---

merchants who supplied complimentary phonograph records for broadcasts began insisting on radio acknowledgment. *See* Archer 199.

18. *See* Barnouw 106–107; Archer 275–277.

19. Barnouw 106–107. *Cf.* C. Siepmann, Radio, Television, and Society 7 (1950) [hereinafter Siepmann]: "We are today so accustomed to the dominant role of the advertiser in broadcasting that we tend to forget that, initially, the idea of advertising on the air was not even contemplated and met with widespread indignation when it was first tried."

20. *See generally* Barnouw 131–134, 157–160.

21. Archer 285–286, 361, 363; Barnouw 177–178; Siepmann 10–11.

22. At the time the Radio Act was passed, "time-selling stations were still a minority; the climax of a struggle between commercial and noncommercial interests lay ahead." Barnouw 200; *see also id.*

at 202–203; Siepmann 10 ("[I]n 1929 the National Association of Broadcasters adopted 'Standards of Commercial Practice,' which specifically barred commercial announcements from the air between the hours of seven and eleven in the evening.").

23. S.Rep.No.772, 69th Cong., 1st Sess. 3 (1926).

24. The portion of the Conference Report which deals with the relevant section of the bill states:

The jurisdiction conferred in this paragraph is substantially the same as the jurisdiction conferred upon the commission by section 1(c) of the Senate amendment. The important change from the provision of the Senate amendment is that while under the Senate bill this original jursdiction was vested permanently in the commission, the jurisdiction is by this compromise * * * limited to one year in time.

H.Rep.No.1886, 69th Cong., 2d Sess. 17 (1927); S.Doc. 200, 69th Cong., 2d Sess. 17 (1927).

with the condition[s] existing, that any broadcasting station can hope to prosper if it attempts to set up a method by which it would charge the listener in; but I know of no reason why the Congress should interfere with that kind of private business any more than it should interfere with any other kind of private business.

(68 Cong.Rec. 2880–81 (1927).) The bill prohibiting direct charges was never passed, and further references to pay broadcasting during the debates were sparse and inconclusive; in most of these discussions, the principal concern seems to be the possibility that large chain broadcasting organizations would obtain monopoly power, through patent licensing agreements or other devices, and use pay broadcasting schemes to extract monopoly profits from the public. *See generally* 68 Cong.Rec. 2576–2577, 2580, 3033–3034, 4149 (1927). In the years intervening between the passage of the Radio Act of 1927 and the issuance of the Commission's *Fourth Report* on subscription television, Congress has, on occasion, been confronted with the suggestion that the present Act authorizes the Commission to license direct-charge broadcasting services,[25] but no legislation restricting the broad mandate of the original Act has been forthcoming.

■ Thus, we are unable to agree that the Communications Act absolutely precludes the Commission from approving a system of direct charges to the public as a means of financing broadcasting services. Rather, the Act seems designed to foster diversity in the financial organization and *modus operandi* of broadcasting stations as well as in the content of programs, and we feel that the Commission did not exceed its authority in concluding that subscription television is entirely consistent with these goals.

### B. *Rate Regulation and Licensing Power*

■ Petitioners seek to negate the broad sweep of the Communications Act by asserting that the Commission lacks the authority to regulate the rates charged by STV operators, and that the absence of such authority reflects Congress' intent to prevent the Federal Communications Commission from authorizing direct-charge broadcasting. The contention that the Commission lacks rate-making authority for over-the-air STV is predicated on the structure of the statute: the Communications Act distinguishes between communications "common carriers" and "broadcasting" operators, providing the Commission with explicit authority to establish tariffs for the former but not for the latter. *See* 47 U.S.C. §§ 201, 203 (1964). However, we need not reach the difficult question of whether Commission power to establish rates for broadcasting services is implicit in some provisions of title III, since we are unable to agree with petitioners' interpretation of the role which rate-making authority plays in the Communications Act.

■ Federal control over telephone and telegraph evolved earlier than did regulation of radio broadcasting, and, in its early forms, it encompassed supervision of the rates charged by companies providing service.[26] Yet, with this model

25. *See, e. g.,* Fourth Report, 15 F.C.C.2d at 598–599; Second Report on Subscription Television, 16 P&F Radio Reg. 1539 (1957); 98 Cong.Rec. 9032–9033 (1952). The proceedings leading up to the instant case reflect Congress' inability to agree on limitations of the Commission's power in this area. On September 12, 1968, the day after the House Committee on Interstate and Foreign Commerce passed its resolution urging the Commission to defer action on STV (*see* part I, *supra*), nine members of the Commerce Committee sent a letter to the Commission which stated, in part, that the resolution "represents the thinking of the barest majority of those present at the Commerce Committee hearing" and "does not represent a mandate to the Commission." The letter concluded: "In our opinion, the failure of the FCC to act promptly to decide the 13-year-old rulemaking proceeding on subscription television would be inconsistent with your responsibilities imposed by the Administrative Procedure Act and contrary to the public interest * * *." Fourth Report, 15 F.C.C.2d at 471–472.

26. *See* 36 Stat. 539, 544–546 (1910).

of common carrier treatment for a communications service available in 1927, Congress elected to establish a less rigorous system of federal control for broadcasting. The significance of this differential treatment was noted by this court in Pulitzer Publishing Co. v. FCC, 68 App.D.C. 124, 126, 94 F.2d 249, 251 (1937):

> [W]e have never said that a radio broadcasting station is a public utility in the sense in which a railroad is a public utility. Generally speaking, that term comprehends any facility employed in rendering quasi public service such as waterworks, gas works, railroads, telephones, telegraphs, etc. The use and enjoyment of such facilities the public has the legal right to demand; but its right to the use and enjoyment of the facilities of a privately owned radio station is of a much more limited character.
>
> * * * [T]he power of Congress has not yet been extended to the point of fixing and regulating the rates to be charged by the licensee or the establishment of rules requiring it to serve alike the entire public in the use of its facilities.

*See also* FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 869 (1940). In short, we think that it is fair to infer that the differential treatment accorded to communications common carriers and radio broadcasters in the Communications Act reflects Congress' belief that commercial broadcasting is not a natural monopoly which creates the same kinds of risks that a telephone system does. Rather, Congress apparently believed that once the clear dangers of combinations in restraint of trade were removed, competition among those providing broadcasting services in a given area would best protect the public interest. It is also significant that in both the Radio Act of 1927 [27] and the present version of the Communications Act,[28] the principal method which Congress provided for

combatting anticompetitive practices is regulation through the licensing process —a method which the Commission deemed sufficient to prevent any abuses of economic power by STV operators. *See* Fourth Report, 15 F.C.C.2d at 548, 596–597.

We approve the Commission's conclusion that it was not called upon to decide whether, or in what circumstances, its licensing regulatory functions might include surveillance or control over rates charged for services. The need for such control would presumably be rooted in developments in the market which demonstrated that STV had been granted a monopolistic or "quasi-monopolistic" position, in which the competition of ordinary TV or other services was not effective to prevent abuse. On the basis of the rates charged in the Hartford experiment, the FCC concluded there was no likelihood of rate abuse. Appellants claim that these rates were kept artificially low in order to obtain a good climate for general approval of STV. Perhaps so, but the Commission was entitled to take into account the facts as they now exist, without ranging into such speculation. If and when the premises of its regulatory approach change, the Commission can and should consider the issues involved. *American Airlines, Inc. v. CAB,* 123 U.S.App.D.C. 310, 359 F.2d 624, 633 (*en banc*), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Its predictions as to the probable course of rates and existence of meaningful competition are certainly not unreasonable; and it is equally certain that the FCC was not required to stake out at this time the techniques and methods it might desire to use in future circumstances that have not yet and may not ever take shape. "In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing which jurisdictional base and which regulatory tools will be most ef-

---

**27.** *See* 44 Stat. 1162, 1168–1169 (1927).

**28.** *See* 47 U.S.C. §§ 313, 314 (1964).

fective in advancing the Congressional objective." Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App. D.C. 298, 300, 359 F.2d 282, 284 (1966).

### C. *The Question of Arbitrariness*

Petitioners advance a separate but related challenge to the Commission's treatment of the rate regulation question. Petitioners contend that, even if the authorization of STV was within the scope of the Commission's power, its action in the *Fourth Report* was arbitrary and capricious because the Commission failed to set forth adequate reasons for its decisions to employ regulatory measures less drastic than rate-making, and to avoid detailed inquiry into the question of whether it possesses the authority to establish rates.

In essence, petitioners' argument rests on the premise that STV operations will be monopolies similar to the public utilities which have traditionally been subject to rate regulation (Brief for Petitioners at 41). In turn, this postulate apparently rests on the assumption that the relevant product market is the television *station*, and that a finding of any other product market would be so unreasonable as to be capricious.[29] The question of market definition is hardly that simple. Within the confines of the *Fourth Report*, there are statements by various parties suggesting a number of other possible product markets affecting STV: all entertainment available in a given area; all television programming available in the area; all programs or performances of a given type, such as motion pictures or sporting events, which could be seen in live performances and other media; subcategories within program types, such as films less than two years old or athletic events featuring home town teams; and unique individual programs. *See generally* 15 F.C.C.2d at 474–478, 494–509. Obviously, entertainment is an industry in which antitrust concepts such as product market and cross-elasticity of demand[30] are exceptionally difficult to apply; the inquiry is further complicated by the fact that the copyright law operates to create some permissible monopolies within the general area.

■■ In light of the extensive discussion devoted to these topics in the *Fourth Report* and the considerations enumerated in the preceding section, we are not prepared to hold that the Commission was arbitrary and capricious in determining that a substantial amount of economic competition would exist between STV and the other forms of entertainment and enlightenment available in the community.[31] Courts should be very reluctant, we think, to declare that free market forces must be supplanted by rate regulation when neither Congress nor the agency administering the area has found that such regulation is essential.

### IV. THE FIRST AMENDMENT AND EQUAL PROTECTION ISSUES

Petitioners also challenge the propriety of the Commission's actions on the grounds that the authorization of STV

---

29. Brief for Petitioners at 41 (emphasis in original):

> The Commission urges that rate regulation is unnecessary since: "We believe that the market place will regulate charges that are paid * * *." Yet, it can fairly be asked: What market place? The Commission has limited pay television to *only one station* in each city with five television allocations. Under these conditions, it is simply fallacious to argue that a "market place" exists, the operation of which would protect the public. There is no "market place" when there is a government-authorized monopoly.

30. *See, e. g.,* United States v. Columbia Pictures Corporation, 189 F.Supp. 153, 183–192 (S.D.N.Y.1960); Section of Antitrust Law of the American Bar Association, Antitrust Developments 1955–1968 at 66–70 (1968).

31. The Commission devoted considerable attention to the likelihood that STV will compete not only with free television, but also with motion picture theatres and other "box office" attractions. *See* 15 F.C.C.2d at 474–488, 497, 508–509.

constitutes an invidious discrimination against indigent persons who will be unable to afford STV equipment or fees and that the program restrictions imposed upon STV operations constitute an impermissible restraint on free speech violative of section 326 of the Communications Act [32] and the first amendment to the Constitution. At the outset, there is some doubt whether petitioners possess the requisite standing to raise these issues. We note, for example, that in the proceedings before the Commission petitioner Joint Committee Against Toll TV proposed and urged adoption of program restrictions which were quite similar to the ones which they now attack (J.A. 19–24), and that organizations vitally interested in free speech supported approval of STV as a means of promoting diversity of expression (*see* part IVB, *infra*). Similarly, it is significant that the Commission concluded from the Hartford experiment that in at least one instance STV subscribers were able to observe a major sporting event in their homes at a per capita cost which was substantially less than the prices being charged for viewing the same event on closed circuit television in neighborhood theaters (15 F.C.C.2d at 485). At the same time, we are familiar with the line of authority cited by petitioners which supports an expansive interpretation of the standing requirement when challenges to the legality of administrative action are made;[33] moreover, we think that petitioners' long and vociferous opposition to the establishment of STV, both here and before the Commission, is evidentiary of "concrete adverseness which sharpens the presentation of issues· upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed. 663 (1962) ; *see also* Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Finally, since we have determined that petitioners' constitutional claims must fail on the merits, we shall assume without deciding that they possess the requisite standing.

## A. *Discrimination Against the Poor*

Petitioners rely on several findings in the *Fourth Report* to support their contention that the Commission's authorization of nationwide STV will result in unconstitutional discrimination against people in low income groups. Specifically, they point to data from the Hartford experiment which showed that less than two percent of all subscribers had incomes in the range of $0–$3,999 (15 F.C.C.2d at 493), while nearly thirty percent of the national population in 1964

---

32. 47 U.S.C. § 326 (1964) :

> Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.

A logical extension of petitioners' constitutional arguments could well render any form of direct-charge broadcasting unconstitutional. Thus, it could be argued that rules against siphoning of programs, talent, and audiences are required in order to prevent STV from damaging free television and imposing impermissible hardship on poor people ; but any rules against siphoning would violate the first amendment, and thus the Commission and Congress are without power to approve direct-charge broadcasting.

33. The leading case is FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693 (1940), where the Supreme Court stated that in enacting the standing provisions of the Communications Act, 47 U.S.C. § 402 (1964), Congress "may have been of the opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission * * *." The Court held that the standing thus conferred encompassed "any relevant question of law in respect of the order of the Commission." *See also* Office of Communication of the United Church of Christ v. FCC, No. 19,-409 (D.C.Cir., June 20, 1969) ; National Association of Securities Dealers, Inc. v. SEC, 136 U.S.App.D.C. ——, at ——, 420 F.2d 83, 95–101 (1969) (Chief Judge Bazelon concurring).

had incomes of less than $4,000; thus, they conclude that the authorization of STV is "systematic discrimination" against thirty percent of our citizens.[34] We need not reach the question of whether the concepts of equal protection applicable to the federal government by implication from the due process clause of the fifth amendment (*cf.* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)) are any different from the concepts of equal protection applicable to the states under the fourteenth amendment; by any accepted standard of equal protection, we find the petitioners' claim insubstantial.

Since the Commission promulgated a number of rules designed to protect free television from economic incursions by STV—rules which we think are reasonable and amply supported by the record—we must confine our inquiry to the proposition that any form of pay broadcasting would, by itself, be discriminatory against the indigent. We must also assume that the charges imposed by STV operators will not be exorbitant, since we have affirmed the Commission's determination that rate regulation is not presently needed to prevent monopoly profits. Thus, unless there is some factor which serves to distinguish broadcasting from other endeavors which are subject to federal regulation, we are being asked to render a decision which would go far toward establishing the rule that every service provided by a regulated industry must be made available to all citizens on the basis of their ability to pay. Such a result would clearly be a constitutional innovation that we are unwilling to make; and we are not convinced that the subject of television broadcasting has unique features distinguishing it from comparable regulated industries.

The equal protection cases cited by petitioners bear scant resemblance on their facts to this controversy; rather the cases involve poll taxes (Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)) and the administration of criminal justice (Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)). Petitioners attempt to relate these cases and their progeny to subscription television by arguing that "in order to fulfill their citizenship requirements, or, indeed, to effectively achieve their rights, the poor must have access to the mass media" (Brief for Petitioners at 46). We think that this doctrinal bridge is far too insubstantial to bear the weight of petitioners' argument, and that their analysis fails to take account of the realities which the Commission considered in authorizing STV.

The public's access to the broadcast media has never been wholly free; at minimum, it has been necessary to procure and maintain the necessary apparatus for receiving broadcasts, and this burden necessarily weighs heaviest on those with least resources. Moreover, any "deprivation" of access to the broadcast frequencies which may result from the Commission's approval of STV will almost certainly be slight. At most, one out of five stations serving a given community will be devoted to STV under the rules promulgated by the Commission; this station will be required to carry at least twenty-eight hours of free programming per week. The Commission also adopted detailed programming restrictions which are designed to prevent the more popular kinds of free programs from migrating to subscription television. At the same time, the Commission found that the authorization of STV may create benefits for all citizens which

---

34. As a matter of statistical technique, we have some doubts about the reliability of figures obtained by comparing data taken from the Hartford area to data taken from the whole nation; in theory, it is possible that the Hartford area con-

tains a substantially smaller proportion of people in the low income levels than does the nation as a whole, and that as a result the two percent figure is misleading. For present purposes, however, we shall disregard this potential discrepancy.

could well offset any deprivation. Thus, in some communities approval of STV operations could result in the opening of a new station rather than the conversion of an existing free station; in this situation, there would be a net gain in the amount of free broadcasts because of the STV operators' obligation to provide free programs (15 F.C.C.2d at 494). Similar considerations will be present when an existing station that is in serious financial difficulties manages to survive by converting to subscription operations *(Id.)*. Subscription television may also make available to a larger viewing public entertainment which would otherwise be unavailable for reasons of distance, lack of seating space, the desire of promoters to protect their gate receipts, or because the per capita cost of STV viewing is less than attendance at a "live" event. *Cf.* 15 F.C.C.2d at 484–485. Finally, there is also the possibility that competition from STV will spur the free broadcasting networks and stations to make substantial improvements in their services, resulting in an overall gain in the quality of television programming (15 F.C.C.2d at 505). In short, we believe that the Commission gave full and fair consideration to the potential impact of STV on poor people and free television, and that its findings, conclusions, and rules on these issues were reasonable.

B. *The Program Restrictions and the First Amendment*

 Petitioners' final contention is that the program restrictions which the Commission established in order to prevent STV from siphoning programs, talent, and audiences from free broadcasting are repugnant to section 326 of the Communications Act and the first amendment of the Constitution as a prior restraint on free speech. In general, these program restrictions provided that: (1) no advertising could be broadcast during subscription operations, except for announcements promoting STV programs; (2) feature films could not be offered which had been generally released more than two years prior to the broadcast date, with several exceptions; (3) sports events which had been regularly broadcast live on free television in the two years preceding their subscription broadcast could not be shown on STV; (4) no series program with interconnected plots or substantially the same cast of characters could be offered on a subscription basis; (5) not more than ninety percent of the total STV broadcasting hours could consist of feature films and sports events combined. 15 F.C.C.2d at 597–598.

At the outset, it is appropriate to note the extreme difficulty and delicacy of the tasks which the first amendment imposes on the Federal Communications Commission. The Commission is charged with administering a scarce communications resource, the broadcast spectrum, in such a manner that the great objectives incorporated into the first amendment are realized and debate on public issues is "uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964). Thus the Commission must seek to assure that the listening and viewing public will be exposed to a wide variety of "social, political, esthetic, moral, and other ideas and experiences." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1795 (1969). In seeking to provide the broadcasting media with the diversity demanded by the first amendment, however, the Commission must avoid the perils of both inaction and overzealousness—of abdication which would allow those possessing the most economic power to dictate what may be heard, and of censorship which would allow the government to control the ideas communicated to the public. The need to make choices of this kind requires the Commission to take some cognizance of the kind and content of programs being offered to the public.[35]

35. *See, e. g.,* Black Hills Video Corp. v. FCC, 399 F.2d 65 (8th Cir. 1968); Buckley-Jaeger Broadcasting Corp. of California v. FCC, 130 U.S.App.D.C. 90,

Further, the Commission must be cautious in the manner in which it acts; regulations which are vague and overbroad create a risk of chilling free speech, while rules which are too finely drawn will arouse judicial suspicion that they are designed to suppress uncongenial ideas. *Cf.* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 395–396, 89 S.Ct. 1794 (1969). We are convinced that the Commission acted within these limits in promulgating its rules for subscription television.

In Banzhaf v. FCC, 132 U.S.App.D.C. 14, 33–35, 405 F.2d 1082, 1101–1103 (1968), we established several tests which can aid in determining whether Commission rulings and orders are in conflict with the first amendment. The first consideration mentioned in *Banzhaf* is whether the rulings ban speech, and, as the petitioners point out, the STV restrictions prevent subscription licenses from broadcasting certain kinds of programs. This characterization of the STV rules ignores their context and purpose, however; it seems obvious that the Commission sought only to insure the continuing economic vitality of free television and not to affect the ideas which could be presented on either free or subscription television. Thus, when the net effect of the program restrictions is considered, it seems quite likely that the public in STV areas will receive more rather than less diversity of expression in its television programming. It is significant that the American Civil Liberties Union and the Americans for Democratic Action urged the Commission to approve STV as a means of opening new avenues of speech, and suggested regulations which were similar in some respects to those ultimately adopted in the *Fourth Report* in order to assure that existing economic forces were directed toward achieving maximum diversity of expres-

sion. *See generally* 15 F.C.C.2d at 516, 526, 546–547, 554–555, 575. Here, as in *Banzhaf*, the likely result of the Commission's action is to provide the public with additional information and ideas rather than repressing existing sources. *See* 405 F.2d at 1103.

In addition, we note that the restrictions now being challenged deal with categories of speech which are, if anything, farther from the central concerns of the first amendment than those at issue when comparable rulings have been upheld by the courts. In *Red Lion*, the Supreme Court upheld against first amendment attack the "fairness doctrine," which restricted broadcasting stations' control over political statements—speech which is certainly the core of the first amendment guaranty. Similarly, our opinion in *Banzhaf* upheld restrictions which required broadcasters to allocate time for opponents of cigarette advertising, a matter which was characterized as a public health issue. We think that the STV rules create far less risk of diminishing the debate on vital public issues. Finally, the Commission found that STV would be a beneficial supplement to present television offerings, provided that neither service could acquire sufficient economic power to drive the other from the marketplace. The program restrictions are designed to preserve this balance and to insure against programming duplication; thus it can be said here, as in *Banzhaf*, that "[e]ven if some valued speech is inhibited by the ruling, the First Amendment gain is greater than the loss." 405 F.2d at 1102.

Since our review of the petitioners' contentions reveals no error in the Commission's determinations, the *Fourth Report and Order* must be

Affirmed.

397 F.2d 651 (1968); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967); Bay State

Beacon, Inc. v. FCC, 84 U.S.App.D.C. 216, 171 F.2d 826 (1948).